**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

THE CITY OF NEW YORK, *et al.*,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF DEFENSE, *et al.*,

    *Defendants.*

No. 1:17-cv-01464
Hon. Claude M. Hilton
Hon. Michael S. Nachmanoff

## DECLARATION OF GRANT A. FLEMING

Pursuant to 28 U.S.C. §1746, I, GRANT FLEMING, declare and state as follows:

1.    I, Grant A. Fleming, am currently assigned as the Program Director for National Security Programs at the Defense Criminal Investigative Service's (DCIS) Headquarters in Alexandria, VA. I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am authorized by law to conduct investigations and make arrests for felony offenses. I have eighteen years of federal law enforcement experience and have been employed with DCIS since August 2012. Throughout my career, I have worked numerous investigations of fraud against the federal government, public corruption and other felony level offenses.

2.    Due to the nature of my official duties, I am familiar with DoD's provision of criminal history information to the FBI. The statements I make in this declaration are made on the basis of my personal knowledge, upon information acquired by me from DoD staff in the course of performing my official duties, and upon conclusions reached and determinations made in accordance therewith.

Defense Criminal Investigative Service

3.      DCIS is a component of the Department of Defense's (DoD) Office of Inspector General

(OIG) and is responsible for conducting criminal investigations into matters essential to DoD

programs and operations.  Pursuant to the Inspector General Act of 1978, as amended, DCIS has

broad criminal investigative jurisdiction for DoD programs and operations.  DCIS jurisdiction

includes any investigation that ensures the integrity of the procurement system from fraud and

other criminal violations, such as public corruption, financial crimes, product substitution, health

care fraud, computer crimes, and the illegal theft, export, diversion, transfer, or proliferation of

DoD technology.  DCIS has approximately 350 credentialed Special Agents and DCIS

investigations result in approximately 260 individual criminal convictions per year.

4.      On November 6, 2017, DCIS Executive Leadership established a working group at DCIS

Headquarters to review all DCIS policies and procedures to ensure DCIS personnel appropriately

reported criminal history information to the Federal Bureau of Investigation's (FBI) Criminal

Justice Information Services (CJIS) Division for entry into FBI databases.  The working group

was also tasked to verify the criminal histories of individuals investigated by DCIS from 1998 to

present were accurately reflected in FBI databases.  To date, DCIS has provided updated written

guidance to all DCIS personnel, provided training to DCIS field agents and supervisors and

reviewed the criminal histories of individuals investigated by DCIS back to 2010.  DCIS has also

established additional internal controls to enhance the data integrity within DCIS and FBI

databases.

5.      The review of the criminal histories of individuals investigated by DCIS between October

2010 and October 2017 disclosed the majority, approximately 95%, of the individuals had

2

criminal histories identified in FBI databases. Nearly all of these individuals were prosecuted and convicted in federal United States District Courts as a result of joint investigations with the local United States Attorney's Office and other federal law enforcement agencies. Individuals investigated by DCIS are rarely referred to military officials for prosecution under the Uniform Code of Military Justice (UCMJ) or state-level officials for prosecution in state or local courts. In most circumstances, the individuals were fingerprinted and processed by the United States Marshals Service (USMS) at the local federal District Courthouse. The USMS processed the individuals in the Joint Automated Booking System (JABS) and transmitted the data to FBI's CJIS Division for entry into FBI databases. Some individuals were fingerprinted and processed by the FBI, Homeland Security Investigations (HSI) or other joint federal agencies in their electronic booking system.

6.    DCIS has worked closely with the FBI's CJIS Division and partner law enforcement agencies to ensure the criminal histories of individuals investigated by DCIS are promptly reported and accurately reflected in FBI databases. An examination of the approximately 5% of individuals not identified in FBI databases has led to new DCIS policies, procedures and internal controls to improve the accuracy of reporting. Many of these individuals were entered, but not properly processed in federal or state-level electronic booking systems. DCIS is currently coordinating with federal and state officials to better understand these issues. DCIS is also submitting the names of these individuals to the FBI's CJIS Division for entry into the National Instant Criminal Background Check System (NICS). In addition, since November 2017, DCIS has submitted approximately 900 criminal Disposition Reports to FBI's CJIS Division to update the criminal history records located in their Interstate Identification Index (III) database. These

individuals were previously reported and entered into III; however, many had incomplete final disposition information.

Army

7.    The Army's two law enforcement agencies are the Army Military Police ("MP") and the U.S. Army Criminal Investigation Command, which is referred to as the "Criminal Investigation Division" or "CID." The Army Provost Marshal General promulgates policy for both the MP and CID. MPs respond to and investigate misdemeanor-level offenses, while CID agents investigate felony-level offenses.

8.    As of November 2017, the Army reported information to the FBI on individuals who are prohibited from possessing a firearm using one of two primary methods. The first method is the submission of fingerprints and final disposition reports for offenses investigated by MP or CID, in accordance with Army Regulation (AR) 190-45, Law Enforcement Reporting, chapter 4 (Offense Reporting) and Department of Defense Instruction (DODI) 5505.11, Fingerprint Card and Final Disposition Report Submission Requirements.

9.    Under the procedures in AR 190-45, MP and CID field units submit the fingerprints of military personnel investigated for UCMJ offenses listed in Table 4-1 of AR 190-45, after the servicing legal advisor determines that there is probable cause to believe that the individual has committed a listed offense. (*See* AR 190-45, para. 4-9.c.(3)(a).) In the case of civilians investigated by MP or CID, the individual's fingerprints are submitted within 15 days after the civilian was interviewed by MP or CID, or was arrested by civilian authorities, or was charged with an offense by the filing of an information or indictment in a civilian court, as applicable. (*See* AR 190-45, para. 4-9.d.)

10.    MP and CID field units obtain an individual's fingerprints using the FBI fingerprint card,

Form FD-249, or by digital means using the "Live Scan" system. The MP or CID field unit

submits the fingerprint card or digital fingerprint scan to CID Command's U.S. Army Crime

Records Center (USACRC) in Quantico, Virginia. The USACRC then submits the fingerprints

to the FBI's Criminal Justice Information Services (CJIS) Division for inclusion in the Next

Generation Identification (NGI) biometric database. The USACRC, or the MP or CID field unit,

later reports the final disposition of the offense for which the individual was investigated by

submitting to CJIS an FD-249 with final disposition information or an R-84 Final Disposition

Report. (*See* AR 190-45, para. 4-9.)

11.    The second method for reporting individuals prohibited from possessing a firearm is the

reporting of Army personnel who received a court-martial sentence that included a dishonorable

discharge (enlisted members) or a dismissal (officers). An Army enlisted member or officer who

received a dishonorable discharge or a dismissal is prohibited from possessing a firearm under 18

U.S.C. § 922(g)(6) (i.e., they are persons "discharged from the Armed Forces under dishonorable

conditions"). The Army reports such individuals on a monthly basis via an automated electronic

submission of information from the Army Court of Criminal Appeals Court-Martial Information

System Database (ACMIS) to the Department of Defense Manpower Data Center (DMDC),

which in turn directly submits this information to the FBI.

12.    On November 5, 2017, the Army initiated a review of its policies and procedures for

compliance with its criminal justice information reporting requirements. The Army established a

Criminal Justice Information Working Group to ensure that that the Army is in full compliance

with its reporting requirements. The Working Group is comprised of senior members of the

Office of the Provost Marshal General, Army CID Command, the Office of The Judge Advocate

General, and staff members of the Army Staff and Major Army Commands. The Working Group initially met weekly, now bi-weekly, to establish milestones for full compliance with reporting requirements, and to ensure that those milestones are achieved.

13.    As part of its review of its policies and procedures, the Army determined that in order to ensure that individuals known to the Army who are prohibited from possessing a firearm are identified during a NICS background check, the Army must be able to submit information on such individuals directly to the NICS Index via electronic means.

14.    In early November 2017, the USACRC worked directly with the military liaison specialists at the FBI's NICS Business Relations Team to develop a process for the Army to extract data from its law enforcement and military justice (court-martial system) databases – which are the Army Law Enforcement Reporting and Tracking System (ALERTS), Military Justice Online (MJO) and the previously discussed ACMIS – and to submit that data directly to the FBI.

15.    Under this new process, the USACRC extracts data from ALERTS, MJO and ACMIS regarding individuals who are prohibited from possessing a firearm. The USACRC's Chief Information Officer then converts that data for direct upload using the FBI's Law Enforcement Enterprise Portal. This data includes the individual's biographic data (name, social security number, date of birth, gender and ethnicity), the individual's offense or conviction data, and the category under which the individual is prohibited from possessing a firearm under 18 U.S.C. § 922(g) or (n).

16.    The USACRC employed this new process to upload to the FBI the data of individuals in ALERTS, MJO and ACMIS from 1989 to the present. This initial mass submission of data was completed on November 17, 2017 and continues to be updated weekly.

17.   Since it was not possible to readily identify individuals who had not yet been reported to

the FBI under the legacy system of submitting fingerprints and final disposition reports, the

Army submitted the data of individuals known to be prohibited from possessing a firearm based

on data extracted from ALERTS, MJO and ACMIS regardless of previous reporting.

18.   As of February 28, 2018, the number of individuals submitted by the Army to the FBI

using the new electronic data submission method is reflected in the following table:

| Category of Individuals Prohibited from Possessing a Firearm | 18 U.S.C. § 922 subparagraph | Number of individuals reported |
|---|---|---|
| Individuals convicted at an Army court-martial of a crime punishable by imprisonment for a term exceeding one year | (g)(1) | 19,107 |
| Individuals processed as a military deserter (i.e., an individual considered to be a "fugitive from justice.") | (g)(2) | 9 |
| Individuals with a positive urinalysis for use of a controlled substance within the past year | (g)(3) | 6,897 |
| Individuals adjudicated as either (1) lacking mental responsibility at the time of an offense, (2) lacking capacity to participate in a trial by court-martial, or (3) found not guilty of an offense due to lack of mental responsibility at a court-martial (i.e., an individual "adjudicated as a mental defective") | (g)(4) | 13 |
| Individuals that received a court-martial sentence that included a dishonorable discharge (enlisted members) or a dismissal (officers) | (g)(6) | 6,412 |
| Individuals who have been convicted at a court-martial of a misdemeanor crime of domestic violence | (g)(9) | 271 |
| Individuals that have court-martial charges referred for adjudication to a general court-martial, which is the military justice system's equivalent of a felony criminal trial (this category corresponds to being "under indictment for a crime punishable by imprisonment for a term exceeding one year") | (n) | 223 |
| | TOTAL | 32,932 |
| NOTE: The Army does not report information to the FBI on individuals prohibited from possessing a firearm under section 922 subparagraphs (g)(5) (aliens illegally or unlawfully in the United States and nonimmigrant visa holders); (g)(7) (individuals who have renounced their United States citizenship); and (g)(8) (individuals subject to court-issued restraining orders). | | |

7

19.   The Army's Criminal Justice Information Working Group continues to monitor the submission of data for newly-prohibited individuals and is working to improve the Army's legacy fingerprint and final disposition reporting procedures.

20.   On February 6, 2018, representatives from the FBI conducted an all-day training session with Department of Defense, Army, and other Services personnel on criminal justice information reporting and submission of information to the NICS Index.

21.   The USACRC continues to directly update the information provided to the FBI weekly. Furthermore, the NICS Business Relations Team's military liaison sends the USACRC a weekly e-mail to provide the Army with an update on the Army's submissions and the number of NICS background checks that resulted in denial of a weapons purchase based on the Army's submissions.  The following table reflects the number of NICS background checks conducted between November 17, 2017, and February 28, 2018, that have been identified as resulting in a denial to purchase or possess a firearm based on information provided by the Army:

| Category of Individuals Prohibited from Possessing a Firearm | 18 U.S.C. § 922 subparagraph | Number of background checks denied |
|---|---|---|
| Individuals convicted at an Army court-martial of a crime punishable by imprisonment for a term exceeding one year | (g)(1) | 145 |
| Individuals with a positive urinalysis for use of a controlled substance within the past year | (g)(3) | 95 |
| Individuals who have been convicted at a court-martial of a misdemeanor crime of domestic violence | (g)(9) | 1 |
| Individuals that have court-martial charges referred for adjudication to a general court-martial (i.e., individuals "under indictment for a crime punishable by imprisonment for a term exceeding one year") | (n) | 1 |
| TOTAL | | 242 |

Navy

22. The Navy has committed to ensuring the appropriate processes and associated training are in place to comply with criminal justice reporting requirements and timely transfer of information to the Federal Bureau of Investigation (FBI).

23. With respect to correcting past reporting omissions, the Navy Office of the Judge Advocate General (OJAG) is reviewing its electronic databases for general court-martial referrals and convictions, special court-martial domestic violence convictions, and dishonorable discharges. Upon completion of this review, OJAG will submit any required criminal justice data to Naval Criminal Investigative Service (NCIS) for forwarding to the FBI. This will ensure that the FBI has the information of the most serious offenders who should be prohibited from possessing firearms. The initial set of criminal justice data will be submitted to NCIS within 30 days, with follow up on specific cases as needed.

24. Additionally, the Navy has directed a review of all remaining categories to ensure that any available criminal justice information will be reported to NCIS for forwarding to the FBI. The Navy is building additional processes and allocating additional manpower to review paper records, since most records of investigations and dispositions of investigations that do not result in courts-martial are stored at the local command level throughout the Fleet, and prior to 2007 there was no data base for courts-martial. The initial set of criminal justice data will be submitted to NCIS within 90 days.

25. To address this issue moving forward, the Navy is undertaking two actions. First, the Navy is implementing interim policy that will ensure compliance with Gun Control Act of 1968 and any associated reporting requirements, per 34 U.S.C § 40901, and DoDI 5505.11. This interim policy will be in place within 30 days. Second, the Navy is implementing separate interim policy to ensure accurate and timely collection of fingerprints and forwarding of reports of disposition

in cases investigated by DoD law enforcement organizations, per DoDI 6400.06. This interim
policy will be in place within 90 days.

Navy Criminal Investigative Service

26.   Since November 2017, the Naval Criminal Investigative Service (NCIS) has taken the
below measures to ensure compliance with DoDI 5505.11.

27.   NCIS Headquarters issued a policy directive mandating the collection and submission of
fingerprints belonging to individuals under investigation by NCIS when NCIS determines
probable cause exists to believe an individual has committed an offense listed in Enclosure 2 of
DoDI 5505.11. The directive further mandates the fingerprints be submitted to the FBI and that
disposition information also be submitted once a decision on administrative/judicial action is
received by NCIS.

28.   Per the policy directive, NCIS special agents are also required to document fingerprint
submissions in investigative reporting by including the associated Transmission Control Number
(TCN), which is unique to each submission, in a report that becomes part of the official case file.
Inclusion of the TCN in investigative reporting enhances the ability of NCIS field level
managers, NCIS Headquarters, and the NCIS Inspector General, to conduct quality control
measures, ensuring compliance with DoDI 5505.11, during mandated Management Internal
Control visits and reviews.

29.   NCIS Headquarters now requires the submission of both the FD-249 form and the R-84
final disposition report form for any case where fingerprints have been submitted even when
final disposition is known at the time of initial fingerprint submission. This internal control

10

mitigates the risk of a fingerprint submission being lost in transmission to the FBI. The

completion of the R-84 form must be documented in the final report of each case file prior to a

NCIS investigation being closed.

30.   NCIS Headquarters is revamping its biometrics division to provide oversight over NCIS'

fingerprint submissions. In conjunction with the service Judge Advocate General Corps, NCIS

will query court-martial convictions for a given timeframe to ensure fingerprint submissions are

being consistently sent to the FBI. The biometrics division will audit NCIS fingerprint

submissions and verify the final disposition is on file for every fingerprint submission.

31.   In response to the DoD Office of Inspector General recommendation to perform a

comprehensive review of past NCIS investigations, NCIS organized a task force of special

agents and professional staff to evaluate NCIS case files from 1998 to the present. As of

February 21, 2018, the task force had reviewed 39,244 NCIS case files, submitted 104 missing

disposition reports, and updated 5,588 NICS records. These NICS submissions were

accomplished as a safeguard to ensure that information on prohibited persons is provided to the

FBI and does not mean that a fingerprint submission was not also provided to the FBI.

Marine Corps

32. The provisions of DoDI 5505.11and DoDI 6400.06 were implemented in the Marine Corps

under Marine Corps Administration Messages (MARADMIN) 186/03 and 209/04.

MARADMIN 186/03 sets forth Marine Corps policy for implementing the Lautenberg

Amendment. MARADMIN 209/04 directed commanders "to report all actual, suspected or

alleged criminal offenses to the Provost Marshal's Office." One of the several purposes of

MARADMIN 209/04 was to capture criminal justice information for reporting to the FBI.

11

33.  On November 7, 2017, the Marine Corps established the Criminal Justice Information

Reporting Task Force (CJIRTF) to assess and identify any gaps in reporting criminal justice

information in qualifying cases, remediate gaps in past reporting, and propose corrective actions

to ensure proper reporting in the future.  The task force identified several critical factors related

to reporting criminal justice information: gaps in policy and procedure governing how

information is handled and reported; lack of training for commanders and other stakeholders

regarding criminal justice information reporting requirements; equipment and software shortfalls

to electronically submit fingerprints and disposition reports; and compliance oversight.

34.  In reviewing past information, the task force employed two methods.  First, the task force

searched personnel and legal records for indications that a person is prohibited from receiving,

possessing, transporting, or shipping firearms under 18 U.S.C. § 921 et seq.  Second, the task

force searched electronic records dating back to 2004 (the start of the Marine Corps' electronic

criminal justice information system) to identify individual gaps in reporting fingerprints and

dispositions.  These records were then compared to federal law enforcement databases

maintained by the FBI; where discrepancies were identified, the task force provided that

additional information to the FBI.  The Marine Corps continues to analyze both personnel/legal

records and criminal justice information, and will report additional information to the FBI as it is

discovered.

35.  Following the analysis and recommendations of the task force, the Marine Corps has

undertaken the following: (A) Drafting a new MARADMIN that will clarify policy and close

procedural reporting gaps.  Additionally, the Staff Judge Advocate to the Commandant of the

Marine Corps has published directive guidance to trial counsel and Staff Judge Advocates

regarding the handling of this information; (B) Updating instructional material to educate

12

commanders, senior enlisted advisors, and legal officers/chiefs on their roles and responsibilities;

(C) Updating the Marine Corps electronic fingerprint reporting capability by procuring and

fielding 39 electronic fingerprint scanning machines (LiveScan) for all 17 of our installations by

the beginning of April 2018; (D) Improving compliance oversight by including fingerprinting

and disposition reporting as an inspectable item by the Inspector General of the Marine Corps, as

well as updating functional area inspection checklists; and (E) Compiling required information to

report on deficiencies noted in the DoD IG report of December 4, 2017.

### Air Force

36.   Since November 2017, the Air Force Office of Special Investigations (AFOSI) and

Security Forces have stood-up two 30-person task forces to examine, as far back as data

accessibility allows, with a goal of 20 years, records with qualifying indexing offenses, as

defined in DoDI 5505.11.  The review of legacy records has been ongoing since late November

2017.

37.   AFOSI implemented a 3-tier National Crime Information Center (NCIC) indexing review

process at the detachment level, region headquarters and higher headquarters, to reduce the risk

of human error.  AFOSI now requires verification that information was uploaded, received and

appropriately captured in the NCIC database.  While AFOSI's review and verification process

has changed, the process for submitting Criminal History Data to the NCIC database has

remained unaltered for AFOSI since no deficiencies were identified in the process itself.  In

addition, AFOSI secured the ability to directly upload firearm prohibition data for qualified

personnel into the NICS database.  AFOSI is also facilitating the direct upload of Security Forces

initiated NICS data.

38.   Security Forces are accelerating the transition to digital fingerprinting from the use of paper fingerprint cards, FD 249s, to enhance compliance with reporting requirements.  Security Forces have also revised their instructions to more precisely specify reporting requirements and provide increased command oversight of the reporting process to better ensure overall indexing compliance.  Additionally, the revised instructions mandate criminal cases remain open until confirmation that criminal history data was received by the FBI.  Furthermore, to address training and compliance deficiencies, the Deputy Chief of Staff for Logistics, Engineering and Force Protection issued more robust training requirements to the field that provide consistent procedural guidance regarding indexing compliance and reporting to the FBI.  To date, this training has been mandated across Security Forces and 99% of units have completed the training.

39.   The Air Force also initiated a Special Interest Item to inspect AFOSI and Security Forces compliance with indexing policies and procedures throughout the Air Force.  The inspection period began on December 15, 2017 and will last for two years for active duty units, with an additional two years for Air National Guard units.  In addition, in coordination with the Headquarters Air Force Deputy Chief of Staff for Logistics, Engineering and Force Protection, and the Major Command Inspectors Generals, the Air Force Inspection Agency conducted an inspection of indexing compliance and training at 24 Security Forces units across all Major Commands.  Identified deficiencies are being addressed by stakeholders.

40.   In addition to changes made in training, policy, procedures, and ongoing legacy records reviews, the Air Force is working to assess options to improve data-sharing and database management amongst stakeholders in the indexing process, primarily, AFOSI, Security Forces and Judge Advocates.  The Air Force is also partnering with the other Services and law

enforcement agencies to identify and implement additional efficiencies and to enhance standardization.

41.    Finally, the Air Force Audit Agency will conduct periodic audits, starting in 2018, of criminal indexing compliance.  These audits will validate the effectiveness of implemented measures.  The Air Force Inspector General is monitoring the implementation of corrective measures.

I declare under penalty of perjury that the above information is true and correct to the best of my belief.

Executed on:  3|5|2018                    _Grant A. Fleming_
                                          GRANT A. FLEMING